

**MICHELLE M. HARNER**
**U.S. BANKRUPTCY JUDGE**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Council of Unit Owners of the | * | |
| 100 Harborview Drive Condominium, | * | Case No. 16-13049-MMH |
| | * | |
| Debtor. | * | Chapter 11 |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

This dispute involves two matters that most individuals hold very dear—their families and their homes. As such, emotions have run high throughout the various underlying administrative and judicial proceedings, which began in January 2010. The Court understands that both parties adamantly believe in their respective positions. By its analysis below, the Court means neither to diminish nor disparage how any of the parties feel they may have been treated over the past several years. The Court's evaluation of this dispute, however, must focus on the evidence in the record and the applicable legal standards.

The above-captioned Debtor's pending second Motion for Partial Summary Judgment (the "Debtor's Second Motion") [ECF 545] relates to the proofs of claim filed in this chapter 11 case by Dr. Paul C. Clark, Ms. Rebecca Delorme, and Paul Clark, Jr. (the "Creditors").[*]

---

[*] All references to pages in the "Debtor's Second Motion," the "Debtor's Third Motion," or the "Creditors' Motion" refer to the corresponding pages in the Memorandum in Support of that particular motion.

Specifically, by the Debtor's Second Motion, the Debtor seeks summary judgment denying all aspects of the Creditors' claims based on alleged violations of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604 and 3617 (the "FHA Claims"). The Creditors filed an opposition to the Debtor's Second Motion (the "Creditors' Second Opposition") [ECF 567], and the Debtor filed a reply in support of the Debtor's Second Motion (the "Debtor's Second Reply") [ECF 631].[1] As explained in detail below and based on the evidence in the record, the Court finds that there are no genuine issues of material fact and that the Debtor is entitled to judgment as a matter of law on the FHA Claims.

## I.        Relevant Background on Chapter 11 Case

The Debtor is an unincorporated condominium association, comprising "any person, firm, corporation, trust, or other legal entity … holding legal title to a condominium unit" in the building located at 100 Harborview Drive (the "Building"). Memorandum of Law in Support of Creditors' Motion for Partial Summary Judgment [ECF 596] Ex. 2, Art. I (q) (collectively with Creditors' Motion for Partial Summary Judgment [ECF 595] and Line attaching Affidavits [ECF 597], the "Creditors' Motion"). The Building "is a 29-story luxury residential high rise that stands on the shore of Baltimore's Inner Harbor." *In re Council of Unit Owners of the 100 Harborview Drive Condominium*, 572 B.R. 131, 135 (Bankr. D. Md. 2017) (J. Schneider). It "was established in 1993 as a condominium regime and contains 249 units and a health club." *Id.*

On March 9, 2016, the Debtor filed this chapter 11 case. The Debtor seeks to, among other things, reorganize its financial affairs and resolve years of litigation with the owners of two different units in the Building through a chapter 11 plan. Dr. Clark owns one of the units

---

[1] The Creditors filed a Motion to Strike Debtors Reply to Creditors Opposition to Motion for Summary Judgment, as Untimely, and/or, Alternatively, to Strike Affidavit of John H. Cochran (the "Motion to Strike") [ECF 633]. For the reasons stated at the January 5, 2018 hearing on, among others, the Debtor's Second Motion, the Court denied the Motion to Strike as to the Debtor's Second Reply. The Court will enter a separate order on the Motion to Strike.

involved in this litigation—penthouse 4A ("Unit PH4A"). The Creditors' proofs of claim, at claim nos. 46, 47, and 48 (the "Claims"), collectively assert in excess of $25 million in damages against the Debtor. The Claims are based on the FHA Claims, alleged property damage to Unit PH4A, and consequential and other damages allegedly arising from those claims. On January 24, 2017, the Debtor filed objections to the Claims [ECF 264–266]. On February 23, 2017, the Creditors each filed an opposition to the Debtor's objections [ECF 316–318].

On May 18, 2017, Judge Schneider entered a Scheduling Order [ECF 393] with respect to the contested matter involving the Claims (the "Contested Matter"). The Court and the parties have subsequently amended that Scheduling Order several times. [ECF 474, 514, 618, 640]. The parties have conducted discovery and filed a total of four dispositive motions in the Contested Matter. The Court held a hearing for purposes of oral argument on three of these dispositive motions, including the Debtor's Second Motion, on January 5, 2018 (the "Hearing").[2] (The transcript of the Hearing is at ECF 643 (the "Transcript").) A trial on the Contested Matter is set to begin on February 6, 2018.

## II.    Relevant Background of Prior Administrative and Judicial Proceedings

The Creditors and the Debtor have been litigating various issues relating to Unit PH4A for several years. The Maryland Court of Special Appeals summarized "the multiplex of administrative and trial court actions and appeals involving" the Creditors and the Debtor in a 2015 reported decision. *See 100 Harborview Drive Condominium v. Clark*, 119 A.3d 87, 93 (Md. App. 2015). The Court recounts only those aspects of this litigation history relevant to the pending motions.

---

[2] The Court's disposition of the first dispositive motion filed in the Contested Matter is addressed *infra* Part II. The Court's rulings on the Debtor's Third Motion for Partial Summary Judgment (the "Debtor's Third Motion") [ECF 568] and the Creditors' Motion are set forth in a separate Memorandum Opinion and Order, entered simultaneously with this Memorandum Opinion.

In early 2010, the Creditors filed a complaint with the U.S. Department of Housing and Urban Development ("HUD") alleging familial status discrimination stemming from a cease and desist letter, dated January 19, 2010. "In February, the complaint was referred to the Maryland Commission on Human Relations [("MCHR")], which, after investigation, also made a finding of no probable cause on August 17, 2010." *100 Harborview Drive*, 119 A.3d at 95. *See also* Debtor's Second Motion Ex. F. Creditors filed a motion for reconsideration, which MCHR denied. *See id*. at Ex. G.[3]

On October 20, 2010, Dr. Clark filed a lawsuit against the Debtor and its professional property management company, Zalco Reality, Inc. ("Zalco"), in the Circuit Court for Baltimore City. *Clark v. Zalco Realty, Inc., et al.*, 24-C-10-007236 (Circ. Ct. Balt. City) (the "First State Court Action"). In the First State Court Action, Dr. Clark asserted a fraudulent misrepresentation claim and violations of the Maryland Consumer Protection Act against the Debtor and Zalco. These claims involved Dr. Clark's purchase of Unit PH4A in October 2009 and the resale disclosure certificate issued by the Debtor and Zalco in connection with that transaction. The Circuit Court granted summary judgment in favor of the Debtor and Zalco in the First State Court Action, which decision was subsequently affirmed by the Maryland Court of Special Appeals. *See 100 Harborview Drive*, 119 A.3d at 95 (describing result of this particular action).

On September 15, 2011, the Creditors filed another HUD complaint, naming as respondents the Debtor, Zalco, and Dr. John H. Cochran (the former President of the Debtor's Board of Directors (the "Board")). The Creditors alleged discrimination and retaliation against the

---

[3] In May and June 2010, the Creditors filed complaints with the Baltimore City Health Department. The complaints resulted in citations being issued to the Debtor, but the Health Department ultimately "dismissed [the citations] following evidentiary hearings." *100 Harborview Drive*, 119 A.3d at 95. Also in June 2010, Creditors "filed a complaint against Harborview in the Maryland Office of the Attorney General, Consumer Protection Division. The complaint, alleging that Harborview failed to properly maintain the common elements of the building, was later withdrawn." *Id.*

respondents. HUD dismissed the complaint, finding "that no reasonable cause exists to believe that a discriminatory housing practice has occurred." *See* Debtor's Second Motion Ex. H.

On January 14, 2013, Dr. Clark filed a lawsuit in the Circuit Court for Baltimore City under the Maryland Condominium Act, seeking the production of certain documents from the Debtor and monetary damages. *Clark v. 100 Harborview Drive Council of Unit Owners, et al.*, 24-C-13-000322 (Circ. Ct. Balt. City) (the "Second State Court Action"). In the Second State Court Action, the Circuit Court held that the Debtor was not required to produce written legal advice provided to the Debtor or those documents already produced concerning the Debtor's financial affairs, but that it was required to produce certain legal invoices. *See 100 Harborview Drive Council of Unit Owners v. Clark*, 119 A.3d 87 (Md. App. 2015) (describing the Circuit Court's decision and affirming in part, and vacating in part, that decision).

On May 8, 2013, Dr. Clark filed a lawsuit against the Debtor in the Circuit Court for Baltimore City, alleging that the common elements of the condominium were defective, causing mold and water infiltration into Unit PH4A. *Clark v. 100 Harborview Drive Council of Unit Owners*, 24-C-13-002770 (Circ. Ct. Balt. City) (the "Third State Court Action"). In the Third State Court Action, Dr. Clark asserted various causes of action, including breach of contract, negligence, and breach of fiduciary duty. The Third State Court Action is pending in the Circuit Court, but is stayed as a result of the Debtor's chapter 11 case.

On March 24, 2014, Dr. Clark filed a lawsuit against the Debtor in the Circuit Court for Baltimore City, seeking a temporary restraining order and preliminary and permanent injunctive relief that would allow Dr. Clark to send his lawyers to the Debtor's Board and committee meetings. *Clark v. 100 Harborview Drive Council of Unit Owners*, 24-C-14-001537 (Circ. Ct. Balt. City) (the "Fourth State Court Action"). On October 31, 2014, the Circuit Court awarded

summary judgment to the Debtor, ruling that the Debtor's policy resolution barring Dr. Clark's lawyers from the Debtor's meetings "is lawful and proper." *See* Debtor's Second Motion Ex. I. Additionally, in the Fourth State Court Action, the Debtor counterclaimed for injunctive relief, seeking access to Unit PH4A to perform necessary maintenance and repairs on common elements affecting water infiltration into the condominium building and its units. *See* Debtor's Second Motion Exs. K, L.[4] The Circuit Court entered a Permanent Injunction against the Clarks on February 18, 2015, which prevented the Clarks from denying the Debtor access to Unit PH4A. *Id.*

On October 3, 2014, the Creditors filed a lawsuit against the Debtor, Mr. Cochran, and Zalco, captioned *Paul C. Clark, et al. v. Council of Unit Owners of the 100 Harborview Drive Condominium, et al.*, No. 14-3122 JFM (the "District Court Case"). The District Court Case involved allegations by the Creditors that the Debtor, Zalco, and Mr. Cochran violated various provisions of the FHA. On March 23, 2016, the District Court entered an order granting summary judgment in favor of Mr. Cochran (the "March 2016 Order"),[5] and administratively closed the case as to all defendants because of the Debtor's chapter 11 case.[6]

On July 31, 2017, the Debtor filed its first Motion for Partial Summary Judgment (the "Debtor's First Motion") [ECF 437], asserting that the March 2016 Order resolved the FHA

---

[4] The Creditors appealed this decision to the Maryland Court of Special Appeals, which heard oral argument, but had not issued a ruling at the time that the Debtor filed this chapter 11 case. The Court of Special Appeals has since dismissed that appeal. Debtor's Second Motion at 14.

[5] The Court respects the administrative, the state court, and the District Court decisions previously issued in matters involving these parties. As explained herein, the Court, however, has conducted a full review of the issues based on the parties' arguments and the record created by the parties after discovery in the Contested Matter.

[6] The Debtor filed this chapter 11 case on March 9, 2016. The District Court Order acknowledges the Debtor's bankruptcy at note 1 in its Memorandum Opinion and also correctly notes that the automatic stay of 11 U.S.C. § 362(a) did not apply to the nondebtor party against which the District Court Order was entered. The District Court did not designate the March 2016 Order as final under Rule 54(b) of the Federal Rules of Civil Procedure, and no party requested such a designation. The Creditors did not file an appeal of the District Court Order or ask the District Court to reopen that case. Rather, on March 24, 2016, the Creditors filed a motion for relief from the automatic stay imposed by 11 U.S.C. § 362(a) [ECF 33]. By the stay motion, the Creditors sought authority to proceed with certain prepetition litigation against the Debtor and others in the original fora, including the case that was administratively closed in the District Court. The Creditors' stay motion is still pending.

Claims filed by the Creditors in this case on a full and final basis. The Creditors timely filed an opposition to the Debtor's First Motion (the "Creditors' First Opposition") [ECF 450 and 451], and the Debtor thereafter filed a reply (the "Debtor's First Reply") [ECF 460].[7] The Court held a hearing for purposes of oral argument on the Debtor's First Motion on October 20, 2017. By an Order  dated October 26, 2017 (the "October 2017 Order") [ECF 502], the Court denied the Debtor's First Motion "without prejudice to the parties filing dispositive motions with respect to the FHA Claims in this contested matter on grounds other than claim and issue preclusion as set forth in the Motion." *Id.* Notably, the Debtor's First Motion and the October 2017 Order addressed the doctrines of claim and issue preclusion solely with respect to the March 2016 Order.

### III.    Summary of Facts Relating to FHA Claims

Dr. Clark is the owner of Unit PH4A. Creditors' Motion Ex. 1. He purchased the unit on or about October 27, 2009, as a new home for his family. Creditors' Second Opposition Delorme Aff. Ex. 1, at ¶ 2. He moved into Unit PH4A with his wife, Ms. Delorme, and their young son in early November 2009. Creditors' Second Opposition Delorme Aff.  Ex. 1, at ¶ 3. In 2009, and at all times subsequent thereto, the only noise and nuisance policy in place for the Debtor and the Building was contained in the Debtor's bylaws. Debtor's Second Motion Ex. O Art. XIII. Section 20 of those bylaws provides:

> Section 20. Unit owners, their tenants and guests, shall not make any disturbing noises in the units, nor do anything that will interfere with the rights, comfort or convenience of other unit owners, and shall not play any musical instruments or phonograph, radio or television in the unit if it will disturb or annoy any residents of the building in which the unit is located or in any other building. Unit owners, their tenants and guests shall not give or perform vocal instrumental instruction at any time in their unit. Except in the case of an emergency, contractors whose

---

[7] The Debtors also filed a motion to withdraw the reference to the District Court, requesting that the District Court hear all matters in this Contested Matter, including the Debtor's First Motion. By an Order dated September 29, 2017, the District Court denied the Debtor's request [ECF 490].

work may be noisy and disturbing to other residents will be permitted to work only Monday through Friday between the hours of 9:00 AM and 5:00 PM. Unit owners shall not alter the sound deadening originally constructed by the Declarant in and around the units.

*Id*. at § 20, Art. XIII. *See also* Debtor's Second Motion Ex. O § 13, Art. XIII.

Prior to moving into the unit, Giselle Rivera, the general manager for the Debtor at that time, informed the Creditors that their downstairs neighbor, Guy Flynn, had expressed concern about the amount of noise a five year old child would make. Creditors' Second Opposition Delorme Aff. Ex. 1, at ¶ 4. As a result of Mr. Flynn's concerns, Ms. Rivera asked the Creditors where their son would sleep, as well as where he would play. *Id*. at ¶ 6. After the Creditors moved into their home, Mr. Flynn emailed the Board and management staff frequently regarding the noise levels in Unit PH4A. *Id*. at Mezrich Depo. Ex. 4, at 26. Mr. Flynn attributed the noise to the Creditors' young son.

Between November 2009 and January 2010, the Board had many discussions concerning Mr. Flynn's noise complaints and potential responses to address the situation. Mollietta Mezrich (the Board's President at the time) and one staff member also visited Mr. Flynn's unit to experience the noise levels. *Id*. at Mezrich Depo. Ex. 4, at 27–28. During this time, the Debtor's staff contacted the Creditors by telephone and by visiting the Creditors' unit to inform them of Mr. Flynn's complaints and to ask them to mitigate the noise. *Id*. at Delorme Aff. Ex. 1, at ¶ 8. Ms. Mezrich received emails indicating that Mr. Flynn expected "the Board to strictly enforce existing rules regarding noise and nuisance" and that he would take action if the Board did not act. *Id*. at Mezrich Depo. Ex. 4, at 54–55.

Shortly thereafter, Ms. Rivera informed Ms. Delorme that the Board was going to hold a hearing on the noise complaints on January 12, 2010. *Id*. at Delorme Aff. Ex. 1, at ¶ 9. Ms. Delorme told Ms. Rivera that she could not attend on that date and asked Ms. Rivera to

reschedule the hearing. *Id*. at Ex. 13. Ms. Delorme also pointed out that the Board had not followed appropriate procedures for scheduling a formal hearing. *Id*. The Board decided to move forward with an informal hearing on January 12, 2010, at which only Mr. Flynn and his lawyers appeared and presented evidence, including a noise study. *Id*. at Mezrich Depo. Ex. 4, at 41, 60; Ex. 31. The Board then issued a cease and desist letter to Dr. Clark and Ms. Delorme on January 19, 2010 (the "2010 Cease and Desist Letter"). *Id*. at Ex. 16. The 2010 Cease and Desist Letter explained what transpired at the January 12, 2010 hearing, asked Dr. Clark and Ms. Delorme to mitigate the noise, provided mitigation suggestions (including, for example, finding alternative play places for their young child), and indicated that they could request a hearing to challenge the letter.

The Creditors did not request a hearing on the 2010 Cease and Desist Letter. Rather, on January 28, 2010, the Creditors filed a complaint with HUD. *Id*. at Delorme Aff. Ex. 1, at ¶ 13. HUD referred the matter to MCHR, which found no probable cause to find discrimination and denied reconsideration of the matter. *Id*. at Ex. 49. Also around the time of the 2010 Cease and Desist Letter, the Debtor designated a children's playroom in the Building. This room, known as the Marina Room, had very few amenities and no bathroom. *Id*. at DeLorenzo Dep. Ex. 15, at 60. *See also id*. at Mezrich Dep. Ex. 4, at 66. It was used as a playroom for only a short time and was subsequently "renovated into a conference room." *Id*. at Mezrich Dep. Ex. 4, at 65. *See also id*. at DeLorenzo Dep. Ex. 15, at 60–61.

In addition to the noise complaints, the Creditors also were dealing with water leaks in Unit PH4A. As a result of water leaks and the detection of mold, the Creditors moved out of Unit PH4A on March 30, 2010, and moved back into Unit 433 at Pierside, which is where they

resided prior to November 2009. *See* Creditors' Motion, at 4–5.[8] The Creditors were in the process of trying to sell Unit 433 at Pierside, but took the unit off the market at that time. *See* Creditors' Second Opposition Delorme Aff. Ex. 1, at ¶¶ 29, 31. The Creditors have resided in Unit 433 at Pierside, which is an approximately 1000 square foot unit, while Unit PH4A is approximately 4000 square feet, since March 30, 2010. *See id.*; Creditors' Motion at 5.

In March 2010, Mr. Cochran was appointed President of the Council. Approximately one month after Mr. Cochran became President, and just a few months after the Creditors filed their discrimination complaint, the Board, for the first time ever, included a "litigation update" section in the Board's monthly newsletter, *Tower Topics*. Creditors' Second Opposition Delorme Aff. Ex. 1, at ¶ 16. The first "litigation update," which appeared in the April 2010 edition of the *Tower Topics*, included information about the Creditors' discrimination complaint, as well as two other matters, one of which involved another family with children. *Id*. at Ex. 17. Subsequent publications by, and meeting discussions of, the Debtor included reports on the status of litigation between the Debtor and the Creditors, as well as others. *Id*. at Delorme Aff. Ex. 1, at ¶ 17–21.

Following these events, in September 2011, the Creditors filed a second discrimination complaint with HUD, as well as the litigation described above in Part II. HUD did not find any probable cause to support the alleged claims of discrimination. Debtor's Second Motion Ex. 8.

In addition, as discussed below, the Creditors had additional interactions with the Debtor and the Debtor's agents after moving out of Unit PH4A in March 2010. For example, on one occasion when Ms. Delorme was taking a construction contractor to Unit PH4A, she was asked to wait for a police escort to accompany her to the unit. Creditors' Second Opposition Delorme Aff. Ex. 1, at ¶ 33. The Debtor also issued a second Cease & Desist Letter to Ms. Delorme in May

---

[8] The Creditors' Motion contains a list of undisputed facts, some of which the Debtor agrees are undisputed, and all of which relate to issues in the Contested Matter, including the Debtor's Second Motion. *See* Creditors' Motion, Undisputed Material Facts, at 1–11; Debtor's Opposition, Debtor's Response to Undisputed Facts, at 1–6.

2011 (the "2011 Cease and Desist Letter"). Creditors' Second Opposition Ex. 37. The 2011 Cease and Desist Letter stated that Ms. Delorme had violated the Debtor's pool rules, which prohibit use of the pool unless a lifeguard is on duty. *Id.*

These facts, with additional details, and further facts in the record are discussed below in Part V, which sets forth the Court's analysis of the FHA Claims and the Debtor's request for summary judgment on those claims.

### IV.    Legal Standards and Evidentiary Objections

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this Contested Matter by Bankruptcy Rule 7056, governs the Debtor's motion for partial summary judgment. A moving party may be entitled to judgment as a matter of law under Civil Rule 56 in the absence of any genuine issue of material fact. Fed. R. Civ. P. 56. *See Emmett v. Johnson,* 532 F.3d 291, 297 (4th Cir. 2008) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986)). *See also Guessous v. Fairview Prop. Inv., LLC,* 828 F.3d 208, 216 (4th Cir. 2016) (discussing standards for summary judgment). "When a party has submitted sufficient evidence to support its request for summary judgment, the burden shifts to the nonmoving party to show that there are genuine issues of material fact." *Emmett*, 532 F.3d at 297. Courts generally will grant summary judgment "unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented." *Stanley Martin Cos. v. Universal Forest Prods. Schoffner LLC*, 396 F. Supp. 2d 606, 614 (D. Md. 2005) (citations omitted).

The court must view the evidence on summary judgment in the light most favorable to the nonmoving party and "draw all justifiable inferences" in its favor, "including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine,* 501 U.S. 496, 520 (1991) (citations omitted). Under Civil Rule 56, a party may

support assertions made in a motion for summary judgment by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials.[9] Fed. R. Civ. P. 56(c). In this Contested Matter, the parties have attached voluminous exhibits to their pleadings. Included in the exhibits are affidavits, emails, letters, answers to interrogatories, condominium documents, and expert reports, among many other documents. The Creditors have objected to several of the Debtor's exhibits, including the affidavit of Dr. Reuben Mezrich in support of the exhibits to the Debtor's Second Motion (the "Mezrich Affidavit"), and the affidavit of Mr. John H. Cochran attached at Exhibit BB to the Debtor's Second Reply (the "Cochran Affidavit").[10]

A court has some flexibility in the kinds of evidence that it can consider in resolving a motion for summary judgment. *See, e.g., Humphreys & Partners Architect*, 790 F.3d 532, 538–539 (4th Cir. 2015). As explained by the U.S. Court of Appeals for the Fourth Circuit, "[a] court may consider materials that would themselves be admissible at trial, and the content or substance of otherwise inadmissible materials where the 'the party submitting the evidence show[s] that it will be possible to put the information ... into an admissible form.'" *Id.* (quoting 11 James Wm. Moore et al., Moore's Federal Practice § 56.91[2] (3d ed. 2015)). On summary judgment, a party "'need only make out a prima facie case showing that [the exhibit] is what he or she claims it to be'" for purposes of authentication under Federal Rule of Evidence 901. *Williams v. Kettler Management, Inc*., 2014 WL 509474, at *4 (D. Md. Feb. 5, 2014) (citations omitted); *Stanley*

---

[9] The Court notes that the parties in the Contested Matter had a full opportunity to conduct discovery, and discovery closed prior to the filing deadline for dispositive motions. The Creditors requested, and the Court granted on a limited basis, one deposition after this time. That deposition was completed approximately one week prior to the Hearing. [ECF 591, 558, 557, 544]

[10] The Creditors also objected to several affidavits and expert reports attached to the Debtor's Opposition. The Court addresses these objections in the Memorandum Opinion and Order relating to the Debtor's Third Motion and the Creditors' Motion.

*Martin Cos.*, 396 F. Supp. 2d at 612–613 (denying request to strike deposition transcripts that were not accompanied by executed court reporter certificates).[11] Moreover, courts, including the Supreme Court, have determined that "a motion for summary judgment may be made pursuant to Rule 56 'with or without supporting affidavits.'" *Celotex Corp.,* 477 U.S. at 324.

The Mezrich Affidavit purports to authenticate the exhibits attached to the Debtor's Second Motion. Dr. Mezrich is the President of the Debtor's Board. In the affidavit, Dr. Mezrich affirms, "under the penalties of perjury," that he has personal knowledge of the facts, has reviewed the memorandum in support of the Debtor's Second Motion, and that "[e]ach of the Exhibits referred to in [that memorandum] are true and authentic copies of what they may purport to be." Debtor's Second Motion Mezrich Aff. at ¶¶ 2, 4–5. The Creditors assert that the Mezrich Affidavit "should be stricken" because Mr. Mezrich "does not, and cannot, have personal knowledge of the facts related to Creditors' FHA Claims since Mr. Mezrich was not a member of Debtor's Board during the relevant period." Creditors' Second Opposition at 4.

As noted above, the central question underlying authentication is whether the evidence is what it purports to be. Evidence Rule 901(b) provides parties with a non-exclusive list for establishing the authenticity of an exhibit. Fed. R. Evid. 901. The proponent may, as here, provide an affidavit. The affiant does not need to be the author of the document, but does need to have personal knowledge on which to base her identification of the exhibit. Moreover, "authentication may be accomplished entirely through circumstantial evidence, and 'any and all manner of circumstantial evidence may be used to establish that the document is genuine.'" *Milbourne v. JRK Residential Am.*, LLC, 2016 WL 1070818, at *3 (E.D. Va. Mar. 15, 2016)

---

[11] Notably, Civil Rule 56 was amended in 2010 and, as stated in the Committee Note to that amendment, "[t[he requirement that a sworn or certified copy of a paper referred to in an affidavit or declaration be attached to the affidavit or declaration is omitted as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record." Fed. R. Civ. P. 56, Committee Note.

(quoting *ABN Amro Mortg. Grp., Inc. v. Mazimum Mortg., Inc*., 2006 WL 2598034, at *5 (N.D. Ind. Sept. 8, 2006)).

The Court has reviewed the Mezrich Affidavit and the exhibits attached to the Debtor's Second Motion and the Debtor's Second Reply. The Court observes that the Mezrich Affidavit does not speak to the merits of any of the claims or allegations in the Contested Matter or any other litigation between the parties. *See Breyan v. U.S. Cotton, LLC Long Term Disability Plan*, 2013 WL 5536795, at *5 (W.D.N.C. Oct. 7, 2013) (noting the limited and proper nature of affidavit purporting solely to authenticate a document). Rather, the focus is on authenticating and identifying each exhibit. Dr. Mezrich also was President of the Board of Directors or a resident in the Building during the relevant period. The former would allow him to review materials maintained in the ordinary course of the Debtor's business, and the latter would have allowed him to observe materials circulated to residents, such as the Building publications.[12] In addition, "the appearance, contents, substance, internal pattern, or other distinctive characteristics" of the exhibits permit their authentication under Evidence Rule 901. *JRK Residential Am*., 2016 WL 1070818, at *3. Considering all of the relevant circumstances, the Court denies the Creditors' request to strike the Mezrich Affidavit.

The Creditors' objection to the Cochran Affidavit presents a more difficult question.[13] As the Court explained at the Hearing, the Cochran Affidavit was submitted on January 3, 2018,

---

[12] *See, e.g., Thomas v. Deutsche Bank Nat'l Trust Co*., 2014 WL 2980363 (N.D. Tex. July 2, 2014) (discussing, and collecting cases on, affiant's personal knowledge based on position); *Lorraine v. Market Am. Ins. Co.,* 241 F.R.D. 534, 545 (D. Md. 2007) ("'[T]he "knowledge" requirement of Rule 901(b)(1) is liberally construed. A witness may be appropriately knowledgeable through having participated in or observed the event reflected by the exhibit.'") (citation omitted).

[13] The Creditors' raised their objection to the Cochran Affidavit in the Motion to Strike, filed on January 4, 2018. The Creditors assert, among other things, that the Cochran Affidavit is untimely and prejudicial and that not all of the statements are appropriate for an affiant. At the Hearing, the Court addressed the issues raised by the Motion to Strike and took the matter under advisement. The Court also explained to the parties that they should use or object to the use of the Cochran Affidavit as they saw fit at the Hearing, and that the Court would rule on all evidentiary objections in connection with its rulings on the underlying motions. Transcript at 4.

well after the filing of the motion it purports to support. Under Bankruptcy Rule 9006(d), which is similar to Civil Rule 6(c),[14] the Debtor should have filed the Cochran Affidavit with the Debtor's Second Motion on November 22, 2017.[15] Nevertheless, courts in this district have recognized that Civil Rule 6(c) does not prohibit the filing of reply affidavits to the extent opposition papers raise new material issues. *See, e.g., Allen v. Enabling Technologies Corp*., 2016 WL 4240074 (D. Md. Aug. 11, 2016). The Court also is mindful that in "[i]n resolving a motion to strike an affidavit, the Court uses "'a scalpel, not a butcher knife" to strike portions of an affidavit that do not satisfy the requirements of Rule 56(c).'" *Glass v. Anne Arundel County*, 38 F.Supp.3d 705, 713 (D. Md. 2014) (citations omitted).

The last minute filing of the Cochran Affidavit is problematic for several reasons. The parties' respective arguments concerning the FHA Claims are not new or even recent, and the Debtor has known for some time that it would be seeking summary judgment on these issues. The original Scheduling Order in the Contested Matter was entered in May 2017, and the Debtor raised the FHA Claims in the Debtor's First Motion in July 2017 and then again in November 2017 in its Second Motion. The Court also notes for the record that it struck the Debtor's Notice of Service of Subpoena *De Bene Esse* of John H. Cochran [ECF 612] for the reasons set forth in the Court's order dated December 29, 2017 [ECF 615].[16] Perhaps most importantly, nothing in the Creditors' Second Opposition raised a new material issue requiring a reply affidavit and the

---

[14] *See Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership, et al.*, 507 U.S. 380, 391 (1993) (noting similarity).

[15] Bankruptcy Rule 9006(d) provides in pertinent part, "When a motion is supported by affidavit, the affidavit shall be served with the motion." *See also Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990) (finding that district court appropriately exercised its discretion under Civil Rules 6 and 56 in striking an affidavit submitted after hearing and in connection with the district court's order allowing the parties to file supplemental memoranda to be within the district court's discretion) (both Civil Rules 56 and 6 amended since decision). Notably, in this Contested Matter, the affidavit was filed before the hearing and arguably within the time period permitted by the schedule articulated in the Court's Orders at Docket Nos. 618 and 592.

[16] The Court held a hearing on the Creditors' request to depose Mr. Cochran on December 14, 2017, and entered an Order granting a deposition in limited scope and duration on December 15, 2017. The Debtor's Notice of Service of Subpoena was filed on December 27, 2017, two days before the scheduled deposition of Mr. Cochran.

timing of the filing—two days before the Hearing—did not allow the Creditors a sufficient opportunity to respond or otherwise address the affidavit in a meaningful way. For these reasons, the Court did not consider the Cochran Affidavit in reviewing the Debtor's Second Motion or issuing its ruling on that motion in this Memorandum Opinion and the related Order.[17]

## V.    Analysis

The FHA is the primary federal law addressing fairness in, and equal access to, housing opportunities for individuals within certain identified protected classes. 42 U.S.C. §§ 3601–3619, 3631. Congress enacted the FHA in 1968, and that first version of the law prohibited discrimination in housing on the basis of race, color, religion, or national origin. *See, e.g., Deer Hill Arms H Ltd. Partnership v. Planning Comm'n*, 686 A.2d 974, 977 (Conn. 1996) (explaining history of the act). It was intended to promote racial integration in communities throughout the country. 114 Cong. Rec. 2270 (1968). The legislative history to the Act indicates a desire to achieve "truly integrated and balanced living patterns" in the United States. 114 Cong. Rec. 3422 (1968).

Congress amended the FHA in 1974 to include sex discrimination within its protected classes, and then again in 1988 to extend that same protection to familial status and persons with disabilities. *See, e.g., Deer Hill Arms H Ltd. Partnership*, 686 A.2d at 977. The objectives of these amendments were similar to those articulated in the original legislative history—e.g., to expand housing opportunities for individuals whom landlords, brokers, sellers, neighbors, and others might want to exclude from particular communities. *See, e.g., Ohana v. Prospect Place Realty Corp.*, 996 F. Supp. 238, 240 (E.D.N.Y. 1998). With respect to "familial status," the

---

[17] As noted *supra* note 1, the Court will enter a separate Order on the Motion to Strike. That Order will incorporate the findings set forth above on the Cochran Affidavit and on the record at the Hearing. It also will reserve the Debtor's right to seek to use the Cochran Affidavit in subsequent proceedings in this case, and the Creditors' right to object to any such use.

legislative history explains: "'[F]amilies with children, like the other classes protected by title VIII, have been the victims of unfair and discriminatory housing practices.'"[18] *Fair Hous. Advocates Ass'n, Inc. v. City of Richmond Heights*, 209 F.3d 626, 632 (6th Cir. 2000) (quoting H.R.Rep. No. 100–711, at 13 (1988), U.S. Code Cong. & Admin. News at 2173, 2174).

The Creditors generally allege that the Debtor discriminated against them because of their familial status and, as a result, violated sections 3604(a), 3604(b), and 3617 of the FHA. They also assert a claim of racial discrimination under the FHA. Section 3604 of the FHA states, in relevant part, that it shall be unlawful,

> (a)    To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.
>
> (b)    To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. §§ 3604(a), (b). Section 3617 of the FHA provides,

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

42 U.S.C. § 3617. The Creditors fall within the definition of "familial status," which the FHA defines to mean "one or more individuals (who have not attained the age of 18 years) being

---

[18] The legislative history further explains: "Both the Congress and the courts have a long tradition of defining and protecting families as 'perhaps the most fundamental social institution of our society.' The Congress has consistently stressed the importance of the family in numerous social welfare programs intended to support children and their parents. In 1949, the federal government made a commitment to 'provide a decent home and suitable living environment for every American family.' Nearly 40 years after this commitment, however, discrimination against families with children prevents millions of American families from realizing this goal." H.R.Rep. No. 100–711, at 19 (1988), U.S. Code Cong. & Admin. News at 2173, 2180.

domiciled with—(1) a parent or another person having legal custody of such individual or individuals ….." 42 U.S.C. § 3602(k).

The Debtor contends that it is entitled to judgment as a matter of law because the record shows that it did not discriminate or retaliate against the Creditors based on their familial status or on account of race in violation of the FHA. The Creditors believe that many, if not most, of the Debtor's acts with respect to the Creditors since 2009 were based on the Creditors' familial status. They also argue that the Debtor's handling of their situation was based on the race of the neighbor submitting the noise complaints.[19] The Court has taken an over-inclusive approach to analyzing the Creditors' allegations as potential causes of action under the FHA, given that the Claims do not state the FHA Claims with any specificity. Claims Nos. 46, 47, 48. The Court was guided by the parties' pleadings and arguments, and it has considered all of the stated facts under sections 3604(a), 3604(b), and 3617 of the FHA. The Court has reviewed all of the pleadings, including all of the exhibits thereto containing admissible evidence,[20] and reaches the following conclusions concerning the Debtor's Second Motion.

---

[19] The FHA Claims are asserted under, and as part of, the Creditors' Claims in this chapter 11 case. For purposes of the claims process, under Bankruptcy Rule 3001(f), the filing of the Creditors' Claims constitutes prima facie evidence of the amount and validity of the Claims. *Stancill v. Harford Sands, Inc. (In re Harford Sands, Inc.),* 372 F.3d 637, 640 (4th Cir. 2004). The Debtor presented sufficient evidence in its objections to the Claims to carry its burden to then rebut the presumptive validity of the Claims. *Id.* Accordingly, the Creditors have "the ultimate burden of proving the amount and validity of the claim by a preponderance of the evidence." *Id.*

[20] At summary judgment, courts "may consider materials that would themselves be admissible at trial, and the content or substance of otherwise inadmissible materials" where it is possible that the evidence can be put "into an admissible form." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538–539 (4th Cir. 2015). *See also* Federal Rule of Civil Procedure 56(c)(2) (stating that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). "If the nonmovant objects to the court's consideration of 'material cited to support or dispute a fact,' Fed.R.Civ.P. 56(c)(2), the movant has the burden 'to show that the material is admissible as presented or to explain the admissible form that is anticipated,' Fed.R.Civ.P. 56 advisory committee's note." *Humphreys*, at 538–539. Except as otherwise noted in this Memorandum Opinion, the parties did not object to the admission of the email or other exhibits attached to the pleadings. With respect to the email exhibits, the Court notes that other courts have found email messages to be admissible under a variety of Evidence Rules. *See U.S. v. Siddiqui*, 235 F.3d 1318, 1323 (11th Cir. 2000) (admitting email evidence over hearsay objection on the basis that the emails constituted admissions of a party pursuant to Federal Rule of Evidence 801(d)(2)(A)); *U.S. v. Levy*, 2008 WL 373646 *5 (Feb. 8, 2008) (discussing circumstances in which emails do not constitute hearsay, and quoting *U.S. v. Safari*, 849 F.2d 891, 894 (4th Cir. 1988) to support admission of emails as non-hearsay because "they were not offered to prove the truth of the matter asserted");

### A.    Familial Status Protection Under Section 3604 of the FHA

Section 3604 of the FHA generally protects families with children from discrimination in accessing housing, as well as in the condition of, or privileges, services, and facilities associated with, housing. *See, e.g., Fair Hous. Cong. v. Weber*, 993 F. Supp. 1286, 1292 (C.D. Cal. 1997). The Creditors allege that the Debtor violated this section of the FHA in several ways. For example, the Creditors point to the language in various emails from Mr. Flynn and the Debtor's Board members, the issuance of the 2010 Cease and Desist Letter and the 2011 Cease and Desist Letter, the Board's treatment of other noise complaints in the Building, the Debtor's general treatment of the Creditors, and the Debtor's alleged delays in the repair and maintenance of Unit PH4A.

A plaintiff "may establish discrimination in violation of the FHAA under a theory of disparate treatment or disparate impact." *Budnick v. Town of Carefree*, 518 F.3d 1109, 1114 (9th Cir. 2008); *Fair Hous. In Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 366 (2d Cir. 2003); *De Reyes v. Waples Mobile Home Park LP*, 205 F. Supp. 3d 782, 787 (E.D. Va. 2016). The Creditors base their claim only on disparate treatment, and they do not allege a disparate impact theory.[21] Transcript at 90. Accordingly, the Court will confine its analysis to disparate treatment.

---

*Avondale Mills, Inc. v. Norfolk Southern Corp.*, 2008 WL 6953956 (D. S.C. Feb. 21, 2008) (denying plaintiff's motion in limine to exclude emails and noting that emails would be admitted or excluded at trial "consonant with the Federal Rules of Evidence."); *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534 (D. Md. 2007) (discussing, in depth, the admissibility of email evidence in the context of all manner of possible evidentiary issues); and *New York v. Microsoft Corp.*, 2002 WL 649951 (D. D.C. Apr. 12, 2002) (analyzing admissibility of email evidence under the "present sense impression," "existing state of mind or condition," and "business records" exceptions to the hearsay rule).

[21] In contrast to the standard set forth above for disparate treatment, "'[a] plaintiff [alleging disparate impact] need not show the defendant's action was based on any discriminatory intent,' but 'must prove the [facially neutral] practice "actually or predictably results in … discrimination."'" *Khalil v. Farash Corp.*, 452 F. Supp. 2d 203, 208 (W.D.N.Y. 2006), *Aff.* 277 F. Appx. 81 (2d Cir. 2008).

A plaintiff alleging disparate treatment must show that the defendant's discriminatory intent was a "motivating factor" in the discriminatory treatment.[22] *See, e.g., Doran v. Prince William Cty*, 2009 WL 10687839, at *3 (E.D. Va. Apr. 24, 2009). Indeed, in the employment discrimination context, the Fourth Circuit has observed, a plaintiff need only present evidence "'that race, color, religion, sex, or national origin was a motivating factor for any employment action."[23] *Hill v. Lockheed Martin Logistics Mgmt., Inc*., 354 F.3d 277, 284–285 (4th Cir. 2004) (en banc) (citation omitted), abrogated on other grounds by *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013).[24]

The disparate treatment theory focuses on a defendant's intent to discriminate against a protected class in the challenged decision or conduct. A plaintiff may establish the requisite discriminatory intent through direct or indirect evidence. *See, e.g., Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (Title VII claim). Although the Creditors suggest they are relying on both direct and indirect evidence of discriminatory intent in their papers, the Creditors stated at the Hearing that they were relying primarily on indirect evidence

---

[22] Courts tend to articulate the standard for discriminatory treatment in different ways, but these standards all require something more than the consideration or the acknowledgement of the plaintiff's protected class. *See, e.g., Casa Marie, Inc. v. Superior Court of Puerto Rico*, 988 F.2d 252, 269 (1st Cir. 1993) ("must show that it was a substantial motivating factor"); *Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 790 (6th Cir. 1996) ("must show that 'discriminatory purpose was a motivating factor'") (citations omitted); *Budnick v. Town of Carefree*, 518 F.3d 1109, 1114 (9th Cir. 2008) (must show that "a discriminatory reason more likely than not motivated the challenged decision"); *Artisan/Am. Corp. v. City of Alvin*, 588 F.3d 291, 295 (5th Cir. Nov. 13, 2009) (must show that discriminatory reason was a "significant factor"). The Court follows Fourth Circuit precedent and will consider whether familial status or race was a motivating factor in the Debtor's decisions or conduct.

[23] Likewise, in the FHA context, the District Court of Maryland has explained: "Where discriminatory 'intent' alone is the basis for § 3604 liability, it is defined consistently with the definition used in Equal Protection cases. Moreover, so long as a state actor undertakes conduct 'because of' race, it need not directly demonstrate racial animus or hatred." *Thompson v. U.S. Dep't Housing and Urban Dev*., 348 F. Supp. 2d 398 (D. Md. 2005) (citing *Adarand Constr., Inc. v. Pena*, 515 U.S. 200, 229 (1995)). The Court notes that this approach is consistent with the language of the statute, which prohibits, for example, discrimination "*because* of race, … [or] familial status." 42 U.S.C. § 3604(b) (emphasis added). Section 3604(a) contains similar language.

[24] Courts generally recognize that claims brought under the FHA "'are analyzed under the same standards that are applied to [] claims brought under Title VII and other employment discrimination standards.'" *Hall v. Greystar Mnmt Servs*., 28 F. Supp. 3d 490, 495 (D. Md. 2014) (citation omitted) (retaliation claim under FHA); *Williams v. 5300 Columbia Pike Corp*., 891 F. Supp. 1169, 1178 (E.D. Va. 1995) ("In evaluating Fair Housing Act claims, courts employ the same method of analysis used in Title VII employment discrimination cases.") (citations omitted).

of discriminatory intent.[25] Transcript at 90–94. A plaintiff using indirect evidence may invoke the burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Likewise, a plaintiff may just frame the argument in terms of direct or indirect evidence supporting a discriminatory intent.[26] *See, e.g., Jacobs v. N.C. Admin. Office of the CT's*, 780 F.3d 562, 572 (4th Cir. 2015) (analyzing discrimination claim under Americans with Disability Act); *Hill*, 354 F.3d at 285. "Under either method, however, the plaintiff must counter the defendant's explanation with some evidence suggesting that the challenged action 'was due in part or whole to discriminatory intent.'" *Budnick*, 518 F.3d at 1114 (quoting *McGinest*, 360 F.3d at 1123).[27]

Courts generally describe the *McDonnell Douglas* shifting burden analysis as follows:

[P]laintiffs must first make out a prima facie case of discrimination. … If the plaintiffs make out a prima facie case, then the burden of production shifts to the defendants to provide a legitimate, nondiscriminatory reason for their decision. … If defendants meet that burden, "the *McDonnell Douglas* framework … disappear[s] and the sole remaining issue [is] discrimination *vel non.*" Plaintiffs "must then prove that the defendants intentionally discriminated against them on a prohibited ground."

---

[25] The Fourth Circuit has explained that "[d]irect evidence encompasses 'conduct or statements' that both (1) 'reflect directly the alleged discriminatory attitude,' and (2) 'bear directly on the contested [housing] decision.'" *Laing v. Fed. Express Corp*., 703 F.3d 713, 717 (4th Cir. 2013) (citations omitted). *See also Pinchback v. Armistead Homes Corp*., 907 F.2d 1447 (4th Cir. 1990) (finding direct evidence of discriminatory intent where "testimony reveal[ed] a singular anxiety on the part of the board over the prospect of blacks coming into the community"). The Creditors did produce evidence in which Board members reference the noise children make or characterizing children as "unsupervised" or "rambunctious." This evidence does not, however, reflect directly a discriminatory attitude by any of the Board members. Moreover, the Court has considered this, and all of the admissible evidence, in the context of indirect evidence and the totality of the circumstances standard articulated by the Creditors.

[26] The case law on disparate treatment articulates slightly different approaches to proving disparate treatment through indirect evidence. Some courts rely solely on the burden shifting test of *McDonnell Douglas*, others adopt a more holistic approach to the evidence to determine whether the indirect evidence supports a finding of discriminatory intent, despite the reason offered by the defendant to support the decision or conduct. *See, e.g.*, *McGinest v. GTE Serv. Corp*., 360 F.3d 1103, 1122 (9th Cir. 2004) (explaining the parties' competing views on the applicable standard and noting that "[t]heir confusion [was] understandable considering the proliferation of conflicting case law on this question"). As the Ninth Circuit explained in *McGinest*, "it is not particularly significant whether *McGinest* relies on the *McDonnell Douglas* presumption or, whether he relies on direct or circumstantial evidence of discriminatory intent to meet his burden." *Id.* at 1123. The Ninth Circuit explained that the ultimate analysis is the same under either method and further described the *McDonnell Douglas* test as a "useful tool." *Id.* at 1122–23.

[27] *Hill*, 354 F.3d at 286 ("Regardless of the type of evidence offered by a plaintiff as support for her discrimination claim (direct, circumstantial, or evidence of pretext), or whether she proceeds under a mixed-motive or single-motive theory, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.") (citations omitted).

*Khalil*, 452 F. Supp. 2d at 207 (citations omitted); *Foster*, 787 F.3d at 250. Under this analysis, as well as the direct/indirect evidence method, the plaintiff bears the ultimate burden of persuasion. *Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 256 (1981) (discussing burden under *McDonnell Douglas* method); *Foster*, 787 F.3d at 252; *Budnick*, 518 F.3d at 1114 (discussing burden under both methods).

Based on the evidence in the record, which is detailed further below, the Creditors have made a prima facie case under the *McDonnell Douglas* analysis. *See, e.g., Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1282 (9th Cir. 2000) (plaintiff may rely on the same evidence for prima facie case and pretext).[28] The Creditors are within the protected class designated as "familial status" under the FHA. They also have identified some evidence to suggest that they may have experienced different treatment than others in the Building. The burden thus shifts to the Debtor to show a "legitimate, nondiscriminatory reason" for the challenged decision or conduct. *See, e.g., Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255, 259 (1981) (explaining the defendant's burden under *McDonnell Douglas*).

Because the defendant's burden to establish a legitimate reason and the plaintiff's ultimate burden of persuasion are the same under both the *McDonnell Douglas* and the alternative direct/indirect evidence methods, the remainder of this Part considers the evidence as a whole for purposes of both methods, in light of the applicable standards for summary judgment. The Creditors and the Debtor have presented emails, documents, and deposition testimony explaining the facts giving rise to the current dispute. Notably, both parties often rely on the same evidence, but emphasize different parts or aspects of that evidence. The Court has

---

[28] Although a plaintiff may rely on the same evidence, a showing of pretext requires more stringent evidence than that required for making a prima facie case. *See Dillard v. Hyatt Corp*., 2014 WL 12686759 (C.D. Cal. 2014); *Foster*, 787 F.3d at 251.

read all of the admissible evidence submitted by the parties, drawing all inferences in the light most favorable to the nonmoving party, i.e., the Creditors.

### 1.     The Debtor's Response to Noise Complaints Generally

The tension between the Creditors and their neighbor, Mr. Flynn, arose even prior to the Creditors moving into Unit PH4A. Mr. Flynn contacted Ms. Mezrich about the possibility of the Creditors winning the auction for Unit PH4A, and Ms. Rivera shared those concerns with the Creditors shortly thereafter. Creditors' Second Opposition Mezrich Email Ex. 3; Delorme Aff. Ex. 1, at ¶¶4, 6. These exchanges set the stage for what was to come.

The record shows that the Creditor's neighbor, Mr. Flynn, who owned the unit beneath Unit PH4A, was concerned about the noise coming from Unit PH4A, and he complained about these noise levels to the Debtor's Board. *Id*. at Mezrich Depo. Ex. 4, at 13–14; DeLorenzo Depo. Ex. 15, at 33. Mr. Flynn's complaints consistently identified Dr. Clark's and Ms. Delorme's young child as the source of the noise. Most of the Board's email exchanges, in turn, repeat Mr. Flynn's complaints and attribute the noise to the child.[29] For example, Mr. Cochran's email of December 30, 2009, reads in part:

> Josh's comment that "This child isn't doing anything that most normal kids don't already do." Started me to ask myself, "Would I want a kids' playground above my unit?" Yes it is normal for kids to romp, jump, stomp, bounce balls, somersault, roughhouse, and drop hard objects on the floor. I suppose a very active kid could keep this up all day and into the evening until bedtime. In a single family home, no one is impacted by the noise except those living in the house.

---

[29] The Board's recitation of the complaint under consideration, or using for purposes of discussion the child as the assumed source of the noise, does not amount to an endorsement or ratification by the Board of Mr. Flynn's position or conduct, whatever that may have been. Creditors' Second Opposition at 35. The Creditor did not present evidence to support such an assertion under ratification, vicarious liability, or any agency theory. *See, e.g., Arnal v. Aspen View Condo. Assoc., Inc*., 245 F. Supp. 3d 1261, 1267 (D. Colo. 2017) (noting sufficient allegations to withstand motion to dismiss on agency theory under the FHA).

*Id*. at Cochran Email Ex. 8.[30]

The record does not contain evidence suggesting that the Board was discussing the issue or considering potential alternatives because the source of the noise was a child.[31] The record also does not suggest that the Board was trying to exclude children from the Building or from the facilities. Rather, much of the evidence indicates that the Board was trying to figure out what to do about the dispute between two neighbors—a dispute involving alleged excessive noise in Unit PH4A. For example, the same December 31, 2009, email from Mr. Cochran quoted above goes on to state,

> I have read commentary to the effect that "The Flynns do not have children," [additional, similar commentary]. In my mind[], these sorts of comments are irrelevant and immaterial as if one were to say "The Flynns are black and [they] are lawyers, but the Clark are white and [they] are not lawyers." These sorts of issues do not address the question of whether the quiet, peaceful enjoyment of one's home is being disturbed.[32]

*Id.* Likewise, when Ms. Mezrich was asked whether the Board thought "it would be appropriate to have rules specifically relating to the conduct and—of children," she responded that the Board only "pondered whether we should—we, in fact, decided it would not be appropriate."[33] *Id*. at Mezrich Depo. Ex. 4, at 18.

---

[30] In his deposition, Mr. DeLorenzo (a Board member at the relevant times) testified, "The only thing I remember is that he complained about the child dribbling a basketball." Creditors' Second Opposition DeLorenzo Depo Ex. 15, at 55. When the Creditors' counsel asked why dribbling a basketball was attributed to a child, Mr. DeLorenzo responded, "Well, no adult would normally do that in their home. So it's a safe assumption that it was a child." *Id.*

[31] Several Board members noted that often comments made by one director were not acted upon and did not represent the sentiment of the Board. Creditors' Second Opposition Mezrich Depo. Ex. 4, at 56; DeLorenzo Depo. Ex. 15, at 70–71.

[32] Mr. Cochran's December 31, 2009 email also notes that, at the time, there were 24 children in the Building, and it sets forth a list of questions that the Board needed to evaluate, such as what other condominium projects do with respect to noise policy, if industry standards existed, and issues concerning sound attenuation in the Building itself. Creditors' Second Opposition Cochran Email Ex. 8. *See also id*. at Ex. 34, at 2 (Board member commenting that noise and nuisance policy should be the same for everyone; email chain also includes a child-specific reference by Mr. Cochran (this email is dated October 2009, prior to that quoted above and at Ex. 8 [567])).

[33] The Creditors underscore the Board's conversations referencing children and the Board's consideration of various policy proposals. Creditors' Second Opposition at 5–6, 35–37. Neither the Debtor nor the Board adopted any facially discriminatory policies towards children. *See, e.g., Dumas v. Sunview Properties*, 2014 WL 585630, at \*5 (S.D. Cal. 2014) (providing examples of facially discriminatory policies against children and summarizing how

A review of the record in its entirety shows that the Creditors and their neighbor, Mr. Flynn, were both upset, and that the Board was struggling to navigate the increasingly tense dispute between these neighbors. The child-specific references and the terminology in some of the Board's correspondence (e.g., statement that the Board should require the child to wear "padded sole shoes such as Nike makes;" statement that Unit PH4A had turned into "a romper room") does satisfy the Creditors' prima facie case. But the Court cannot consider these statements in isolation. Rather, the Court must, as urged by the Creditors' counsel at the Hearing, consider the totality of the circumstances. These, and similar, statements when read in context and in light of the action of the Board, establish that the references to the child were of a descriptive nature, as a means of identifying the alleged source of the noise, and not a motivating factor.[34] *See Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997) (affirming the district court's decision that decisionmaker's derogatory and ethnically based comments about

---

court treat such claims). The Creditors also do not argue that the facially neutral noise and nuisance provision in the bylaws had a discriminatory effect. Finally, in their papers, the Creditors suggest that any legitimate reasons offered by the Debtor must prove to be the "'least restrictive means'" to achieve the stated end. Creditors' Second Opposition at 34 (quoting *Fair Hous. Congress v. Weber*, 993 F. Supp. 1286, 1292 (C.D. Cal. 1997). As noted above, the Court is following Fourth Circuit precedent on the application of the *McDonnell Douglas* and the direct/indirect methods for proving claims under the FHA. Moreover, even if the "least restrictive" standard applies, the Courts does not find a genuine issue of material fact regarding whether the Debtor's conduct met that standard. For example, as noted above, the 2010 Cease and Desist Letter does not require any specific remedy or action, other than mitigating the noise. Creditors' Second Opposition Ex. 16. The child-specific references are phrased in terms of possible alternative solutions. The record contains similar examples with respect to the Creditors' other allegations.

[34] The following are a few additional examples on this point. The Creditors point to an email from Mr. Cochran concerning use of certain areas in the Building for a child's birthday party. The Creditors highlight Mr. Cochran's statement that "[m]y concern is not so much the Baltimore Room but the children in the pool area." Creditors' Second Opposition Cochran Email Ex. 9 Mr. Cochran's email, however, goes on to explain that "[t]here is a risk management question here maybe for RCMD. What if the lifeguard is not on duty during the hours the party is scheduled. If we say yes, use the pool, then we do need to find out if we can get a life guard and who pays for that as well as the administrative time that goes into finding answers?" *Id.* One of the Building's general managers, Mr. Russo, testified at his deposition that the Building had a pool policy that said people could not use the pool when there is no lifeguard on duty. *Id.* at Russo Depo. Ex. 38, at 16. Likewise, the Creditors highlight language in an email from Ms. Mezrich recalling instances in the Building where children were "running wildly" and "behaving rambunctiously around the pool area" and suggesting that "this may be something we do need a policy for." *Id.* at Mezrich Email Ex. 3. As noted above, Ms. Mezrich testified that the Board considered the issue but took no action. *Id.* at Mezrich Depo. Ex. 4, at 18.

the plaintiff were "'too attenuated to be linked to his decision to terminate [the plaintiff's] employment'") (citation omitted).

Accordingly, with respect to the general conversation surrounding the noise complaints, the Debtor articulated a legitimate reason for its conversations and actions in that the Board was required to consider and respond to the complaint of a unit owner in light of the noise policy in Article XIII, Sections 13 and 20 of the bylaws.[35] The Creditors did not offer evidence to suggest that the Board's performance of its duties under the bylaws was pretext or not the real reason for the challenged decisions and actions. The record does not show a genuine issue of material fact on these allegations.[36] That said, the Court considers this evidence as part of its remaining review of whether all of the Board's conduct throughout the relevant time period might support the Creditors' claims.

### 2.    The 2010 Cease and Desist Letter

The Creditors presented evidence that the Board rarely issued cease and desist letters. In fact, the evidence suggests that the Board preferred to have neighbors work out their disputes informally, through dialogue and perhaps mediation. The record also shows that the situation between Mr. Flynn and the Creditors escalated to the 2010 Cease and Desist Letter in less than two months. The Creditors contrast this treatment with that afforded to another unit owner, Nicholas Moore, when he made noise complaints to the Board.

---

[35] The Court notes that, with respect to all of the FHA Claims, the Creditors argued that the Debtor's reasons for their decisions and conduct changed and were inconsistent, thus suggesting those reasons were pretext. The Court recognizes that shifting motives may support a claim for pretext, but the record does not create a genuine issue of material fact on this issue in this Contested Matter. The Debtor's primary reason for its decisions and conduct boils down to the Debtor and the Board trying to fulfill their duties under the Debtor's governing documents and to navigate a tense dispute between neighbors. The various aspects of the Board's process in this respect do not create varying or shifting motives; rather, they speak to the deliberations, considerations, and actions of the Debtor and the Board in the context of the Debtor's governing documents and the neighbor dispute.

[36] *See Celotex*, 477 U.S. at 323 ("The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.").

The Debtor posits that the Board followed its normal course of procedure with respect to the Creditors and Mr. Flynn, including by calling the Creditors, notifying them of the complaints, and asking them to try to mitigate the noise in those conversations.[37] The Board also discussed getting the parties together to try to work things out, but various Board members had indications from the parties that they did not want to talk in that fashion. *See, e.g., infra* note 40. Further, the neighbors themselves indicated that they were relying on the Board to follow the Debtor's policies. The Creditors submitted an email from Mr. Flynn in which he asks of the Building manager, "has your office yet delivered to the 4A owners the required 'cease and desist' letter in accordance with subsection (D) [of Policy Resolution No. 2009-2]?" Creditors' Second Opposition  Ex. 12. Likewise, in a letter explaining that she could not attend the January 12, 2010, hearing scheduled by the Board, Ms. Delorme indicates that the Board had not followed the procedures set forth in Policy Resolution No. 2009-2. *Id.* at Ex. 13.

Ms. Mezrich testified that the following took place around the time of the January 12, 2010, hearing and prior to the issuance of the 2010 Cease and Desist Letter:

> Well, we wanted to follow up with—with—first—first we went and honored Mr. Flynn's request and went and sat up in his unit to hear the noise. He asked that the board do that. I saw that in one of the emails. And so I went up with—with my grandson, I might add. And we sat there for an afternoon. And then the maintenance committee person went up and sat there for an afternoon. And then he had the acoustic tests, which we had suggested he do. And I don't know where—what do you want to know now?

*Id.* at Mezrich Depo. Ex. 4, at 60. *See also id.* at Ex. 33. In addition, the 2010 Cease and Desist Letter explains what transpired at the January 12, 2010, hearing and demands that the Creditors

---

[37] *See, e.g.*, Creditors' Second Opposition Delorme Aff. Ex. 1, at ¶ 6 ("Immediately after moving into Unit PH4A, the Harborview front desk staff repeatedly called me and my husband, and knocked on the door of our unit, and asked that we keep [our] son from making too much noise even though the staff admitted to me that they could not hear any noise coming from our unit in the hall outside of our unit."); Ex. 6 ("In speaking by phone to [the manager] this morning, [we] asked that the front desk please visit 4A and request that the noise be quieted. If anything, the noise worsened in the aftermath of our phone call with [the manager]."); Ex. 16 (a cease and desist letter noting that general manager had previously contacted the Creditors "about the noise and possible steps that could be taken in order to abate the noise"); Mezrich Depo Ex. 4 ¶¶ 32–33.

"cease and desist making the noise in your unit which violates the Council's governing documents and that are causing a nuisance and interfering with the Flynn's right to quiet and peaceful enjoyment of their home." *Id*. at Ex. 16. The letter goes on to suggest ways to mitigate the noise—e.g., finding a new place for the child to play—but does not mandate that result.[38] *Id.* The letter also indicates that the Creditors could "request a hearing before the Board to contest this violation" and "seek arbitration as set forth in Article XV of the By-Laws." *Id.* The Creditors did not seek a hearing or to arbitrate the dispute. They did, however, file a complaint with HUD ten days later.

The Creditors posit that the 2010 Cease and Desist Letter was an act evidencing discriminatory intent. They argue that the Board did not follow its own policy in issuing the 2010 Cease and Desist Letter, that the Creditors filed the HUD complaint (rather than pursuing other remedies) because they believed they were being discriminated against, and that the Board's actions in the Creditors' situation differed from how the Board handled other similar situations. The Court will take each of these arguments in turn.

As noted above, the record contains evidence showing that the Debtor contacted the Creditors and tried to remedy the situation prior to scheduling a hearing on the noise complaints. *See supra* note 37. It also indicates that the Board did some investigation of the complaints. Although this investigation included only two visits by the Debtor's representatives to Mr. Flynn's unit, reliance on the noise study commissioned by Mr. Flynn, and information provided by the Debtor's management staff, the Debtor's Policy Resolution appears to require only "a preliminary investigation" to establish that the complaint is not frivolous. Creditors' Second Opposition Ex. 13; DeLorenzo Depo. Ex. 15, at 65. The Debtor's Policy Resolution also does not appear to require the Board to interview both sides or include both sides in its

---

[38] The letter states that the noises "are consistent with and assumed to be predominantly made by a child." *Id.*

preliminary investigation. *Id.* at Ex. 13. *See also infra* note 41. The evidence supports the Debtor's justification that the Board was trying to navigate the dispute between neighbors in accordance with the Debtor's governing documents and the preferences of the parties.

With respect to the filing of the HUD complaint, the Creditors had no obligation to request a hearing or arbitration under the 2010 Cease and Desist Letter. The Court does not question the Creditors' decision to file the HUD complaint. The Creditors' pleadings in this Contested Matter demonstrate that they felt as though the Board discriminated against them because of their familial status. A plaintiff's subjective beliefs, however, do not determine the legal sufficiency of a claim for discrimination under section 3604 of the FHA. *See, e.g., Elliott v. Grp. Med. & Surgical Serv.*, 714 F.2d 556, 567 (5th Cir. 1983) ("We are not prepared to hold that a subjective belief of discrimination, however genuine, can be the basis of judicial relief."); *Gavin v. Spring Ridge Conservancy, Inc.,* 934 F. Supp. 685, 687 (D. Md. 1995).

The Creditors' argument concerning the Board's treatment of Mr. Moore's noise complaint comes closer to the kind of evidence sufficient to create a genuine issue of material fact on a section 3604 claim. The Creditors have not, however, established that the two situations were factually similar but garnered different treatment. *See Na'im v. Sophie's Arms Fine Residences*, 2015 WL 401257, at *7 (S.D. Cal. Jan. 8, 2015) (in context of plaintiff's motion for summary judgment, discussing similarity between parties required to infer discriminatory intent). *See also Bryant v. Bell Atlantic Maryland, Inc*., 288 F.3d 124, 134 (4th Cir. 2002) (reviewing differences in employees posited as similarly situated in context of Title VII claim). The record shows that Mr. Moore was Caucasian and a unit owner in the Building. The individual living in the unit above Mr. Moore's unit was African American, had a child living with her, and did not own the unit. Creditors' Second Opposition Ex. 27; Mezrich Depo. Ex. 4, at 80–81. Rather, she

was renting the unit. *Id*. at Mezrich Depo. Ex. 4, at 80–81. Mr. Moore submitted several noise complaints concerning the tenant, and the record suggests that the source of the noise was not the child. Mr. Cochran and the Board encouraged Mr. Moore to be patient and to give the Board time to resolve the situation. *Id*. at Ex. 29.

The Debtor posits that the Moore situation was very different from the Flynn situation. The Debtor suggests that neither Mr. Moore nor the tenant were litigious and neither was threatening legal action.[39] *Id*. at Mezrich Depo. Ex. 4, at 49, 80–81; Ex. 29. The Debtor also points out that the Board had less direct involvement in the Moore situation because the owner of the leased unit was ultimately responsible to try to mitigate the tenant's conduct, and the owner was an absentee landlord. *Id*. at Mezrich Depo. Ex. 4, at 80–81. The record supports the Debtor's explanations.

The record also confirms the tension and litigious mindset of the parties involved in the Flynn situation.[40] Ms. Mezrich and Mr. DeLorenzo, both members of the Board at the time, confirmed that Mr. Flynn had involved his lawyers and was suggesting that he would take action if the problem was not addressed. *Id*. at Mezrich Depo. Ex. 4, at 55, 57; DeLorenzo Depo. Ex. 15, at 34, 64. Although, as further addressed below in Part V.B, the Creditors suggest the Board's concern was race-based litigation, Ms. Mezrich's and Mr. DeLorenzo's testimony focus simply on litigation being brought against the Debtor and the Board. As Ms. Mezrich explained,

---

[39] The record contains emails from Mr. Moore showing a dialogue in which Mr. Moore is seeking the Board's help with the noise issue, but recognizing the issue being, at least in part, related to an "absentee landlord." Creditors' Second Opposition Exs. 26, 28. One of Mr. Moore's emails does ask whether he needs to retain a lawyer to address the situation, but there is no evidence that Mr. Moore took any such action, ever threatened litigation, or even against whom he would bring the litigation (e.g., tenant, landlord, or Board). Debtor's Third Motion Ex. 27. The record lacks evidence factually linking the Moore and Flynn situations.

[40] Ms. Mezrich testified that she tried to encourage a dialogue, but that Mr. Flynn "did not have an interest in making friends. He just wanted to know the building's policy if it became a problem." Creditors' Second Opposition Mezrich Depo. Ex. 4, at 21. Mr. Cochran likewise explained, "no warm and fuzzy feelings or desires to hunker down together and get chummy with the Clark family." *Id*. at Ex. 14. Mr. DeLorenzo further recalled that the Board wanted to resolve the situation through dialogue, but that "the Clarks didn't want to meet with the other guy." *Id*. at DeLorenzo Depo. Ex. 15, at 34–35.

"[the board was] always concerned, once we starting having people be litigious in the building, that anybody who was acting angry might sue." *Id.* at Mezrich Depo. Ex. 4, at 57.

The evidence establishes significant, objective differences between the Moore and the Flynn situations, and the Debtor's reason for handling the situations differently is legitimate. The Creditors' focus on the informal approach in the Moore situation and the formal approach in the Flynn situation is factually correct. The Creditors' have not, however, presented evidence to create a genuine issue of material fact that the difference was because of, motivated by, or a pretext for the Creditors' familial status. Rather, Mr. Moore's willingness to talk and the landlord/tenant nature of the situation emerge as the factors guiding the Debtor's decisions in the Moore situation.

### 3.    The 2011 Cease and Desist Letter

The Creditors received a second cease and desist letter in 2011, after they had moved out of Unit PH4A. This letter involved the Debtor's policy that residents could not use the pool if a lifeguard was not on duty. The 2011 Cease and Desist letter was issued to the Creditors and another family, and states that "[t]he Board of Directors and management received a Complaint that each of you and your respective children were in the Harborview swimming pool at a time that the pool was closed and no life guard was on duty." *Id.* at Ex. 37. The Creditors argue that they were not in the pool at the time. They also assert that partygoers were in the pool area at the same time violating the Debtor's policies, but that the partygoers did not receive a cease and desist letter.

The Debtor relies on the lifeguard policy, the relevant incident report, and the 2011 Cease and Desist Letter to support the issuance of the letter as a proper response to a potential safety issue. The Creditors rely on an email from a resident in the Building named Joann Clay and, at

the Hearing, pointed to the deposition testimony of Sasha Russo, an interim general manager at the Building. Transcript at 71. Ms. Clay's email recites what she had been told about the incident, and suggests that neither family was actually in the pool. Creditors' Second Opposition Ex. 36. At the Hearing, the Debtor suggested that Ms. Delorme's statements about the partygoers were hearsay. Transcript at 27. Ms. Clay's email appears to be based on Ms. Delorme's statements. Mr. Russo's deposition testimony indicates that he sent the 2011 Cease and Desist Letter based on the incident report and at the request of Mr. Clark. Creditors' Second Opposition Russo Depo. Ex. 38, at 12–14, 19; Ex. 39. He acknowledged that it was uncommon to send cease and desist letters and that he did not personally investigate the situation.[41] *Id*. at Russo Depo. Ex. 38, at 17–18, 21–22. He further stated that he did not recall other rule violations, that he did not receive Ms. Clay's email, and that "[u]sing the swimming pool after hours is dangerous. You don't want anybody to get hurt."[42] *Id*. at 21–23.

With respect to the partygoers, Mr. Russo did not recall many details, but he observed that "an outdoor party" is "different than a pool party." *Id*. at 26. The Creditors also did not provide any evidence of the age of the partygoers or other details that would support their claim that, if the partygoers were violating policies, the Creditors were treated differently from them based on familial status. Again, the Creditors' bear the burden to establish that the Debtor's legitimate reason offered for the decision to issue the 2011 Cease and Desist Letter was not the real reason or otherwise that the Creditors' familial status motivated the decision. *See, e.g.,*

---

[41] Mr. Russo testified that he would not necessarily speak to the individual alleged to have violated the policy before taking action. Creditors' Second Opposition Russo Depo. Ex. 38, at 20. The Creditor's counsel suggested that such an approach violated the Debtor's bylaws. *Id.* Mr. Russo did not have any recollection of such a bylaw provision. *Id.*

[42] The 2011 Cease and Desist Letter also explains that "[b]ecause this is a life-safety issue, you are to immediately cease and desist from use of the Aquatics Facility except when a life guard is present." *Id*. at Ex. 37. This letter did not require the Creditors to do anything in addition to following the Debtor's policy on pool use. As with the noise policy, the Creditors do not allege that the Debtor's facially neutral pool policy has a discriminatory effect. The 2011 Cease and Desist Letter also, like the 2010 Cease and Desist Letter, provided that the Creditors could request a hearing or proceed to arbitration. *Id.*

*Burdine*, 450 U.S. at 253–254, 259. The evidence does not raise a genuine issue of material fact on this aspect of the claim.

### 4.    Timing of Repairs and Maintenance to Unit

The Creditors allege that the Debtor failed to timely repair the water leaks, conduct mold remediation, and perform other tasks necessary to maintain Unit PH4A, as required by the Debtor's bylaws. Creditors' Second Opposition Delorme Aff. Ex. 1, at ¶¶ 29–30. The Debtor, on the other hand, attributes the timing of repairs and maintenance to Unit PH4A to the complicated roof and façade on the Building, the fact that many of the issues with the unit were new issues and not just one ongoing problem, and the difficulty with obtaining access to the unit to conduct repairs and maintenance. Debtor's Second Motion at 23–25; Ex. Z, at 4–6. The Debtor alleges that access issues were created by the Creditors, in that the Creditors changed the lock on the door, pad-locked the door, and required the Debtor to coordinate access through their lawyers.[43] *See, e.g.*, Creditors' Motion Ex. 30; Debtor's Second Motion Clark Depo. Ex. J.[44]

---

[43] The Debtor asserts that the Creditors' arguments regarding the condition of Unit PH4A and any related repairs and maintenance are barred by res judicata and the Baltimore City Circuit Court's decision in the First State Court Action. Debtor's Second Reply Ex. FF. The Court has reviewed this decision and finds that as to claims or causes of action that could have been brought in the Circuit Court based on the facts set forth in the Creditors' Second Amended Complaint in that matter, the Debtor's position is well taken. *See, e.g., Anne Arundel Cty Bd. of Educ. v. Norville*, 887 A.2d 1029, 1036–1039 (Md. 2005) (explaining the doctrine of res judicata or claims preclusion under Maryland law and noting that Maryland follows the transactional approach for determining if a cause of action was "or could have been" litigated in the prior action). The Court acknowledges that the Creditors may have been able to assert the FHA retaliation claims at that time. Nevertheless, because the Creditors filed HUD claims before and after this action, and because the facts alleged to support the Creditors' arguments extend beyond the date of the Circuit Court's opinion in the First State Court Action, the Court also considers the evidence in the record on this aspect of the claim.

[44] The Court notes that the parties argued many of the issues directly relating to the FHA claims in the Debtor's Third Motion and the Creditors' Opposition to that Motion (the "Creditors' Third Opposition") [ECF 621]. They took a similar approach at the Hearing. The Court will cite the parties' respective evidence attached to these pleadings to the extent relevant to the Debtor's Second Motion. The Court is not relying on that evidence other than to show additional support for the facts identified in the context of each allegation. Thus, in addition to that cited above, the Court observes that the following evidence further speaks to the factors causing delay in repairs and maintenance: Creditors' Third Opposition Peoples Depo. Ex. 74, at 17–19, 24–19 25 (discussing, among other things, challenges with access to unit, and who had keys to unit) [621]; Impallaria Depo Ex. 87, at 28, 43–44, 46–52 (commenting that the Debtor always had urgency to fix, and explaining when needed, and how obtained, access to Unit PH4A). In addition, the correspondence between the parties' respective counsel attached to the Creditors' Third

The evidence shows that the Creditors have had continuous issues, in one form or another, with the condition of Unit PH4A since 2009. Creditors' Second Opposition Delorme Aff. Ex. 1, at ¶¶ 29–30; Debtor's Second Motion Ex. T, at ¶¶ 27–28.[45] These issues include various water leaks, pigeon feces, and mold in the unit. Creditors' Second Opposition Delorme Aff. Ex. 1, at ¶¶ 29–30. The evidence also shows that the Debtor has worked to repair these issues and maintain the unit and that the timing of these tasks often was dictated by things outside of the Debtor's control.[46] *Id.* at DeLorenzo Depo. Ex. 15 at 100, 105, 114; Debtor's Second Motion Clark Depo. Ex. J. *See also infra* note 44. The Court acknowledges the Creditors' stated concern and frustration with the timing of the repair and maintenance to Unit PH4A. The Court does not find, however, evidence to support that the Creditors' familial status was a motivating factor, or the real reason, for the timing of the repairs and maintenance on the unit.[47]

Viewed in its entirety, the record demonstrates that the repairs and other issues with the unit (and the Building generally) were complicated and that the Debtor encountered, among other things, access and financial issues in beginning and completing that work. Although the Debtor's efforts to repair the unit have been ongoing for a number of years, the evidence does not suggest or create an inference that the Creditors' familial status (or, as explained below,

---

Opposition illustrate the dialogue around access in the context of all of the pending litigation. *See, e.g.*, *id.* at Exs. 79, 80, 82.

[45] *See also, e.g.*, *id.* at Impallaria Depo. Ex. 87, 16–18.

[46] The Creditors assert that the Debtor placed a "hold" on all repairs and maintenance to Unit PH4A because of the Creditors' protected activity. The evidence does not support a causal inference between any holds on work in the unit and the Creditors' protected activity. *See, e.g.*, Creditors' Third Opposition Impallaria Depo. Ex. 87, at 21 (never told to "hold" work); Peoples Depo. Ex. 74, at 26–27 (did not recall any holds, "[o]utside of weather, or not having access to the unit"). Mr. Impallaria, the facilities manager at Barkan Management assigned to the Debtor, explained the "hold" noted in the documents as follows, "This would be—say it's on hold because 'We are looking to have the ceilings dropped. We are waiting to have—provide building with date to have contractor open ceilings.' So that would be—it was the 4A's contractor who was removing ceilings. So I would expect that we would be on hold while we are waiting to be provided a date." *Id.* at Impallaria Depo. Ex. 87, at 50–51.

[47] The Court's analysis and determination of this issue in this Memorandum Opinion relates solely to the FHA Claims and does not relate to the similar factual arguments raised by the parties in the context of the Creditors' breach of contract claim.

protected activity) was a factor in the Debtor's decisions regarding when or how it would perform the repairs and maintenance work. The Creditors have not offered evidence to show a genuine issue of material fact regarding the Debtor's motive or real reason for the timing of the repairs and maintenance work to Unit PH4A.

### 5.    The Totality of the Circumstances

In addition to the foregoing analyses, the Court also considered the record as a whole to determine whether the entirety of the Debtor's conduct evidenced a discriminatory intent towards the Creditors based on their familial status. It does not. What the record shows is tension among two neighbors and frustration by both regarding the Board's handling of the situation. Unfortunately, a child was caught in the crossfire. But the Creditors have not presented evidence to show that the child's presence in this dispute was a motivating reason for the Debtor's and the Board's decisions and conduct. Rather, the evidence supports the Debtor's legitimate reasons; the Board was trying to resolve a dispute among neighbors and, again unfortunately, the identification of the child as the alleged or assumed source of the noise was a fact they had to discuss in evaluating the dispute. That fact did not, however, emerge in the evidence as a motivating factor or the real reason for the Debtor's decisions and conduct. The Creditors did not establish a genuine issue of material fact on their claims under section 3604(a) or 3604(b) of the FHA.

### B.    Race Protection Under Section 3604 of the FHA

In addition to discrimination based on familial status, the Creditors also base their FHA claims on racial discrimination under section 3604.[48] The Creditors allege that the Board considered the race of the parties involved in the Flynn situation and the possibility that

---

[48] The general legal standards articulated in Part V.A above apply to claims of racial discrimination under the FHA as well.

Mr. Flynn would file a race discrimination lawsuit if the Board did not act in a certain way. The Creditors contrast this with the race of the parties involved in the Moore dispute and how the Board handled that matter. *See supra* Part V.A.2.

The Debtor responds that the Board was concerned with litigation, but that the kind of potential litigation was irrelevant.[49] The Debtor also underscores the parties' litigious posture in the Flynn situation and contrasts that with the tone and nature of the Moore situation. *See supra* Part V.A.2.

The record does contain references by Mr. Cochran to Mr. Flynn potentially filing a "race discrimination" lawsuit, as well as an acknowledgment that the parties involved in the Flynn matter were of different races. Creditors' Second Opposition Mezrich Depo. Ex. 4, at 56; Ex. 32 (describing the race of the various individuals involved in the dispute). The focus of the Board's discussions, however, is on protecting the Debtor and the Board from litigation and evaluating the Board's potential responses. The Debtor does not deny that race was used as a descriptive term in these discussions, but argues that race was not a motivating factor in the Board's decisions. Debtor's Second Reply at 4, 7–8. Rather, the Board was focused on enforcing the Debtor's bylaws and anticipating potential litigation. The Creditors did not produce evidence to refute the Debtor's claim or suggest that race was a motivating factor in, or the real reason for, the Debtor's decisions or conduct. *See supra* Part V.A.2 (discussing additional evidence in the record regarding the Moore and the Flynn situations). As with the familial status claims, the

---

[49] For example, in response to a question whether the Board was concerned that Mr. Flynn might bring a race discrimination lawsuit, Ms. Mezrich responded, "No. There was an email from Mr. Cochran pointing out race, but the board never responded, nor reacted to that. And the board does not have any issues with race. We did not follow up on race." Creditors' Second Opposition Mezrich Depo. Ex. 4, at 56. As noted above, Ms. Mezrich further explained, "we are always concerned, once we starting having people be litigious in the building, that anybody who was acting angry might sue." *Id.* at 57. Mr. DeLorenzo also discussed how the dispute was between neighbors and the Board's attempts to avoid litigation in the situation. *Id.* at DeLorenzo Depo. Ex. 15, at 36–37. He further stated, "So when Mr. Flynn lawyer—lawyered up and came in with guns drawn, we probably listened to the lawyers more than we had in the past. So the—the cease and desist letter was kind of like a formal response to the situation that had gone out of control in my humble nonlawyer opinion." *Id.* at 64.

Debtor may have discussed race (or the fact that a child was involved), but the record does not show that the Debtor was motivated to act because of race or familial status. The evidence does not raise a genuine issue of material fact on this aspect of the FHA Claim.

### C.    Retaliation and Other Claims Under Section 3617 of the FHA

The Creditors also bring claims against the Debtor under section 3617 of the FHA. 42 U.S.C. § 3617. Specifically the Creditors assert that, because of their protected activity under the FHA, the Debtor delayed repairs and maintenance of Unit PH4A, prohibited their lawyers from attending Board meetings, treated them differently and in a harassing way, and publicized certain information about the Creditors. The Creditors characterize these actions as threats, interference, and retaliation in violation of section 3617 of the FHA.

To prevail on a claim under section 3617 of the FHA, the Creditors generally must show that "(1) [they were] engaged in protected activity; (2) [the Debtor] was aware of that activity; (3) [the Debtor] took adverse action against [them]; and (4) a causal connection existed between the protected activity and the asserted adverse action." *Hall v. Greystar Mnmt Servs.*, 637 Fed. Appx. 93, 98 (4th Cir. 2016); *Foster*, 787 F.3d at 250. The Fourth Circuit in *Foster* applied this general standard in the context of the *McDonnell Douglas* burden shifting analysis described above.[50] Other courts have noted a similar standard when the plaintiff is proceeding on direct or indirect evidence.[51] *See, e.g., Philippeaux v. Apartment Inv. & Mgmt. Co.,* 598 F. Appx. 640, 644

---

[50] The Fourth Circuit observed these factors as part of the plaintiff's prima facie case, which if established shifts the burden to the defendant to show a legitimate reason. "If the [the defendant] makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons 'were not its true reasons, but were a pretext for discrimination.'" *Foster*, 787 F.3d at 250.

[51] At the Hearing, the Debtor argued that a defendant's conduct must be severe or egregious to constitute retaliation under the FHA, citing *Lawrence v. Courtyards at Deerwood Ass'n, Inc.*, 318 F. Supp. 2d 1133, 1143 (S.D. Fla. 2004). The court in *Lawrence* determined that section 3604 applied only to access to housing and not post-acquisition activities. It held, in turn, that "to constitute actionable interference, in the absence of a violation of sections 3603–3606, the discriminatory conduct must be pervasive and severe enough to be considered threatening or violent." *Id.* at 1145. Some courts suggest that the kind of approach followed in *Lawrence* is limited to stand-alone section 3617 retaliation claims, not related to a protected activity under sections 3603–3606 of the FHA. *See,*

37

(11th Cir. 2015) (per curiam). As with the discrimination claim, the Plaintiff bears the ultimate burden to establish the retaliation claim. *Foster*, 787 F.3d at 250, 252.

The Creditors have established by the evidence, specifically the filing of the January 2010 HUD complaint, that they asserted their rights under the FHA. Creditors' Second Opposition Delorme Affidavit Ex. 1, at ¶ 13. All of the actions identified by the Creditors occurred after the filing of the January 2010 HUD complaint. Although the Court does not find a violation of section 3604 in this Contested Matter, some of the facts asserted by the Creditors to support the retaliation claim under section 3617 are different than those asserted in the context of discrimination under section 3604. In addition, as noted above, the Creditors are members of a protected class under the FHA, and the retaliation provisions of the FHA are designed in part, to prevent actions that might chill or deter actions by members of protected classes to assert and protect their rights. *See, e.g., Marks v. BLDG Management Co.*, 2002 WL 764473, at *12 (S.D.N.Y. Apr. 26, 2002). Accordingly, the Court will analyze the Creditors' retaliation claims under the framework established by the Fourth Circuit in *Hall, Foster,* and similar cases.[52]

### 1.    Timing of Repairs and Maintenance to Unit

Similar to the discrimination claim addressed above, the Creditors argue that the alleged delays in repairs and maintenance work to Unit PH4A was in retaliation for the HUD complaint and other protected activity pursued by the Creditors. *See supra* Part V.A.4. The Fourth Circuit

---

*e.g., Fernandez v. Orlando Hous. Authority,* 2016 WL 2784989, at *4, *5 (M.D. Fla. May 13, 2016). *See also* Frazier v. Cooke, 2017 WL 5560864, *5 (E.D. Va. Nov. 17, 2017) (noting that "neither the cases nor legislative history of § 3617 proscribe a minimum level of intimidation or coercion necessary to violate the statute"). Likewise, other courts have suggested that a plaintiff must establish a violation of a right protected by the FHA to sustain a claim for retaliation under section 3617. *See, e.g., Doran*, 2009 WL 10687839, at *8. The different approaches appear, in part, to be based on whether a court interprets a "protected activity" as the pursuit of a claim by a member of a protected class, or a member of a protected class prevailing on such a claim.

[52] *See, e.g., Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004), abrogated on other grounds recognized by *Foster*, 787 F.3d at 299 (addressing EEO complaint in employment retaliation context); *Jarvis v. Burnt Mills Crossing, LLC*, 2015 WL 5092029, at *4 (D. Md. Aug. 27, 2015) (analyzing retaliation claim under the FHA based on "a complaint that [the plaintiff] was a victim of discrimination").

has held that, in the context of a retaliation claim, a plaintiff must establish "'traditional principles of but-for causation' and must be able to prove that 'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the [defendant].'"[53] *Foster*, 787 F.3d at 249 (quoting *Nassar*, 133 S.Ct. at 2533). The Fourth Circuit has also explained that, although the Supreme Court's decision in *Nassar* addressed claims based on direct evidence of retaliation, the "real reason" approach to pretext under *McDonnell Douglas* is consistent with *Nassar* in that it also requires a "but-for cause" of a challenged action. *Foster*, 787 F.3d at 249, 252. Accordingly, whether the Court analyzes the Creditors' arguments under the direct/indirect evidence method or the *McDonnell Douglas* shifting burden method, the Creditors must establish that the Debtor would not have acted as it did but for the filing of the 2010 HUD complaint (or other protected activity).

The totality of the evidence does not support a finding that, but for the Creditors' protected activity, the Debtor would have responded more quickly to the repair and maintenance needs of Unit PH4A. *See supra* Part V.A.4. *See also Doran*, 2009 WL 10687839, at *8 (explaining that plaintiff could not establish retaliation claim based on same facts supporting her unsuccessful discrimination claim). In addition, the evidence does not demonstrate a close temporal proximity to the protected activity and the alleged adverse action. For example, the water leaks in Unit PH4A existed prior to the Creditors moving into the unit, the Creditors were aware of at least pinhole leaks prior to moving in, and the timing of the repairs and maintenance were discussed between the Creditors and the Debtor at that time. Debtor's Second Motion Ex. R; Ex. T, at ¶¶ 27–28; Debtor's Second Reply Ex. FF, at ¶¶ 4–5. Those issues continued on and

---

[53] The Supreme Court has also generally explained that the "ordinary meaning of the word 'because'" is akin to a "but-for cause" of the challenged action in the employment discrimination context. *Burrage v. United States*, 134 S.Ct. 881, 888–889 (2014). The Supreme Court included similar phrases, such as "on account of" within this approach. *Id.* at 889–890.

off, and irrespective of the Creditors' filing the HUD complaints and other litigation. Creditors'

Second Opposition Delorme Aff. Ex. 1, at ¶¶ 29–30; DeLorenzo Depo. Ex. 15, at 100, 105, 114.

The Creditors thus have not shown but for causation or that their protected activity was the real

reason for the Debtor's alleged delay in repairs and maintenance to the unit. The evidence does

not create a genuine issue of material fact on these allegations.

### 2.    Board Resolution Restricting Access

The Creditors assert that certain resolutions passed by the Board constitute adverse action

and retaliatory conduct under the FHA. Specifically, the Board passed two different resolutions

in 2013 that prohibited members, employees, and agents of the law firms representing the

Creditors and Penthouse 4C, LLC, the owner of penthouse unit 4C ("Unit PH4C"), in their

respective litigation against the Debtor from attending the Debtor's meetings. Debtor's Second

Motion Ex. A, at 15–16; Creditors' Second Opposition Ex. 48. The Debtor posits that these

resolutions were valid and legal actions by the Board, and they point to the decision of the

Baltimore City Circuit Court, dated October 3, 2013, in the Fourth State Court Action, in support

of its position. Debtor's Second Motion Ex. I.

The Board adopted the resolutions at issue in May and November of 2013. By that time,

the Creditors had filed at least two lawsuits and two separate HUD complaints against the

Debtor, and the owner of Unit PH 4C was in active litigation with the Debtor. *See, e.g.,*

Creditors' Second Opposition Exs. 17–20 (disclosing actions); Debtor's Second Motion Exs. W–

Z (same); *supra* Part II. The Debtor also faced isolated lawsuits from other unit owners. *See, e.g.,*

Creditors' Second Opposition Exs. 17–20; Debtor's Second Motion Exs. W–Z. In addition to the

costs associated with defending this litigation, at least the lawsuits filed by the Creditors and the

owner of Unit PH4C sought significant damages against the Debtor. Debtor's Second Motion Exs. W–Z.

The Debtor's bylaws and the Maryland Condominium Act give the Council and, in turn, the Board the authority to adopt reasonable rules and regulations.[54] *See* Debtor's Second Motion Ex. O; Maryland Condominium Act § 11-109. The resolutions appear to target only law firms that were representing the Creditors and the owner of Unit PH4C during a very litigious time between the parties. The Creditors argue that the Board's real reason for adopting the resolutions was in retaliation for the Creditors' protected activity under the FHA. In this regard, they note that the residents of Unit PH4C have children and also would be protected by the FHA. The owner of Unit PH4C did not, however, assert any claims under the FHA. The board resolutions also were adopted well after the 2010 and 2011 HUD complaints and well before the FHA complaint filed by the Creditors in the District Court. *See, e.g., Hall*, 637 Fed. Appx. at 99 (discussing causal link and temporal proximity). The significant non-FHA litigation ongoing between the Creditors and the Debtor and the owner of Unit PH4C and the Debtor, as well as the timing of the resolutions, support the Debtor's position. The Creditors did not offer sufficient evidence to create a genuine issue of material fact that, but for the protected activity, the Debtor would not have adopted the resolutions.

---

[54] The Debtor argues that this Court cannot collaterally attack the decision in the Fourth State Court Action. The Court interprets this argument as an assertion that issue preclusion arises under the Fourth State Court Action decision regarding the legality of the resolutions. Under Maryland, issue preclusion arises "'[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.'" *Janes v. State*, 711 A.2d 1319, 1324 (Md. 1998). Maryland courts appear to embrace the position that "the pendency of an appeal should not suspend the operation of a judgment for purposes of res judicata or collateral estoppel." *Campbell v. Lake Hallowell Homeowners Ass'n*, 852 A.2d 1029, 1040 (Md. App. 2004). Thus, the resolution of the issue of legality in the Fourth State Court Action may be entitled to preclusion and the Court acknowledges and respects Maryland state law on this point. It also conducts an independent review in the context of whether the Board action itself—whether legal or not—constitutes unlawful retaliation under the FHA.

### 3.    Police Escort and Other Conduct

In arguing the totality of the circumstances, the Creditors identify various incidents between the Debtor and the Creditors as conduct that was threatening, intimidating, humiliating, and retaliation under the FHA. For example, the Creditors describe an incident in which Ms. Delorme was asked to wait for a police escort before taking a construction contractor to Unit PH4A. Creditors' Second Opposition Delorme Aff. Ex. 1, at ¶ 33. The Creditors also identify the 2011 Cease and Desist Letter and the general treatment of the Creditors in the Building.

The Court considers these allegations on an independent and totality basis. Having reviewed the record, the evidence suggests that the police escort was done to protect the Creditors, and that, in the particular instance identified, the escort was not required.[55] As noted above, the 2011 Cease and Desist Letter is based on a violation of the Debtor's pool policy. *See supra* Part V.A.3. *See also Doran*, 2009 WL 10687839, at *8.[56] The record also does not contain evidence that the Debtor directed the management or staff to treat the Creditors differently or in a particular manner.[57]

The Court acknowledges the facts recited by the Creditors and that at least the police escort situation appears out of the ordinary. That said, the legal question is whether the Creditors' protected activity was the cause for any of the challenged conduct. The Court does not find evidence in the record to create a genuine issue of material fact on causation. Although the Creditors had filed at least the January 2010 HUD complaint prior to these incidents, the

---

[55] Creditors' Second Opposition Ex. 23 (suggesting escort was being arranged given the Creditors' preference to limit access to Unit PH4A).

[56] To the extent that the Creditors assert the 2010 Cease and Desist Letter as an adverse action and retaliation, the Court observes that said letter was issued prior to the filing of the 2010 HUD complaint and that, as set forth in Part V.A.2 and Part V.B, the evidence does not show that familial status or race was a motivating factor or the real reason for the letter. There is no genuine issue of material fact on that potential retaliation argument.

[57] *See, e.g.*, Creditors' Second Opposition Russo Depo. Ex. 38, at 27, 30 (Mr. Russo said that he was never told to single out the Creditors and believed that board treated residents fairly); Creditors' Third Opposition Williams Depo. at Ex. 70, at 11 (Ms. Williams was never asked or instructed to deal with the Creditors in a special way).

evidence does not show that those complaints were the real reason or the causation for the conduct.[58] Indeed, the significant litigation between the parties, the intervention of their respective lawyers in their activities, and the caution in interactions counseled because of the litigation (the First State Court Action was filed in October 2010) emerge as the reasons for the conduct.[59] *See, e.g., Jarvis*, 2015 WL 363620, at \*3 (dismissing retaliation claim where conduct other than the plaintiff's HUD complaints motivated eviction).

### 4.    Publications and Public Discussion of Litigation

The Creditors also point to a series of publications and public discussions about the Creditors' HUD complaints and other litigation in support of their retaliation claims. The first of these publications in the Building's newsletter, titled *Tower Topics*, identified the filing of the January 29, 2010, HUD complaint by the Creditors and was published in April 2010, a little over two months after the filing of the complaint. Creditors' Second Opposition Ex. 17. This April 2010 issue of *Tower Topics* discussed the Creditors' complaint in a new section of the newsletter dedicated to litigation matters involving the Building. Prior to that time, the newsletter did not routinely report on litigation matters. In addition, the Creditors allege that this information was also included in email bulletins, was circulated beyond the Building's community, and was discussed at meetings of other condominium associations in the community. *Id.* at Delorme Aff. Ex.1, at ¶¶ 16–22.

The Debtor responds that the creation of the litigation section in the newsletter and the other discussions of litigation matters were necessary to keep unit owners informed of the status

---

[58] Approximately six months passed between the January 2010 HUD complaint and the discussion surrounding an escort for the Creditors. Creditors' Second Opposition Ex. 23. With respect to the 2011 Cease and Desist Letter, for the reasons discussed above at Part V.A.3, the Creditors did not show that the policy violation and safety concerns were not the real reason or causation for the conduct. *See also Gavin*, 934 F. Supp. at 687 (noting that "the lack of any merit in plaintiff's principal claim bars a § 3617 claim based on the same charge of discrimination").

[59] *See, e.g.,* Creditors' Second Opposition DeLorenzo Depo. Ex. 15, at 100, 105, 114; *supra* note 44.

of significant litigation. *Id.* at DeLorenzo Depo. Ex. 15, at 74–75.[60] The Debtor recites its obligation to make such disclosures in resale certificates under Maryland law. Debtor's Second Motion at 35–37. It also notes that litigation other than that involving the Creditors and the owner of Unit PH4C was included in the newsletter. *See, e.g.,* Creditors' Second Opposition Exs. 17–20; Debtor's Second Motion Exs. W–Z. The Debtor posited that it disclosed all significant litigation that could have an economic impact on unit owners. Creditors' Second Opposition DeLorenzo Depo. Ex. 15, at 74–75.

The Court has reviewed the evidence pertaining to this particular allegation carefully and extensively because of the proximity between the January 29, 2010, HUD complaint and the April 2010 newsletter. A close temporal connection between the protected activity and the alleged adverse action may establish a prima facie case of discrimination.[61] *See, e.g., Hall*, 637 Fed. Appx. at 99. The Court notes, however, that temporal proximity alone generally is not sufficient to establish causation for a retaliation claim. *See Waag v. Sotera Defense Solutions, Inc.*, 857 F.3d 179, 192 (4th Cir. 2017) (explaining that "for purposes of establishing a prima facie case, close temporal proximity … may suffice, … [but the plaintiff] still 'bears the burden of establishing that [the defendant's] proffered explanation is pretext for … retaliation"). Moreover, the Court must identify whether other evidence exists in support or rebuttal of the retaliation claim; the claim does not necessarily rise or fall on temporal proximity.

---

[60] Specifically, Mr. DeLorenzo explained, "Well, we had to strike a balance. So the tone of the discussion was we had to strike a balance between the 247 unit owners that weren't involved in litigation who had a right to know what was going on, and the two unit owners who were involved in litigation. So we were trying to find a path to keep everyone informed, which is the purpose of a newsletter, and not cause harm to the case, I guess." *Id.* at DeLorenzo Depo. Ex. 15, at 75.

[61] In the Title VII context, the Fourth Circuit has required the alleged adverse action to occur "shortly after" the protected activity. *See, e.g., Hall*, 637 Fed. Appx. at 99 (providing examples); *Horne v. Reznick Feder & Silverman*, 154 Fed. Appx. 361, 364 (two months not sufficient where temporal evidence rebutted by other factors). For a discussion of temporal proximity in the context of a retaliation claim under the FHA, see *Newell v. Heritage Senior Living, LLC*, 673 Fed. Appx. 227, 232 (3d Cir. 2016).

Considering the record as a whole, the Court does not find a genuine issue of material fact with respect to the publications and public discussions of the litigation between the Debtor and the Creditors. The evidence shows that the disclosures were made in a consistent and fact-based manner that provided unit owners with information relevant to their economic interests in the Debtor and the Building. These disclosures likewise were removed temporally from the Creditors' protected activity, disclosed litigation in addition to the Creditors' HUD complaints, and disclosed litigants other than the Creditors.[62] The Court's conclusion that the Creditors have not established evidence supporting causation or that the Debtor's articulated reasons are not the real reasons for the alleged adverse action should not be read to suggest that the Court views this conduct as best practices or in compliance with applicable law.[63] The Court focused solely on the protected activity, the Debtor's knowledge of the protected activity, the alleged adverse action against the Creditors, and the causal connection between the protected activity and the alleged adverse action.

### D.    Claims for Punitive Damages and Attorney's Fees

A plaintiff who prevails on a claim under the FHA is entitled to seek punitive damages and attorney's fees. 42 U.S.C.A. § 3613(c). For the reasons set forth above in Parts V.A, V.B, and V.C, the Court is granting the Debtor's motion for summary judgment on the Creditors' claims under sections 3604 and 3617 of the FHA. Accordingly, the Creditors are not entitled to recover punitive damages or attorney's fees under applicable law.

---

[62] Although the April 2010 *Tower Topics* presents a closer issue on temporal proximity, the Court notes that the time between the protected activity and the publication is months and not days. In addition, the timing of the publication also relates to Mr. Cochran assuming the role of President of the Board in March 2010. Debtor's Second Motion, at 10. Although the Creditors argued that said fact supported their position, the Debtor suggested the fact showed that the publication was a decision by the new president to keep residents informed about all significant litigation. Transcript at 112, 142.

[63] For example, the Creditors argue that the filing of a HUD complaint is not public and cannot be disclosed without the Creditors' consent. Creditors' Second Opposition at 39. The Debtor's refute that assertion. Debtor's Second Reply at 21.

### VI.    Conclusion

For all of the forgoing reasons, the Court grants the Debtor's Second Motion for Partial Summary Judgment. The Court will enter a separate Order consistent with this Memorandum Opinion.

**Copies to:**    Paul Sweeney
Lisa Stevens
Brennan McCarthy

### END OF MEMORANDUM OPINION